IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-00381-RBJ

ADRIENNE WAGNER,

      Plaintiff,

v.

BANK OF AMERICA CORPORATION, d/b/a Bank of America, N.A.,
LANDSAFE APPRAISAL, and
CONRAD NORTH,

      Defendants.

---

## ORDER

---

      This case is before the Court on defendant's motion for summary judgment [docket #48], defendant's motion in limine [#53], and defendant's motion to exclude plaintiff's expert [#54].

**Facts**

      Ms. Wagner is an appraiser who was employed by LandSafe Appraisal Services, Inc. from April 2008 until she was terminated on May 9, 2011.  Ms. Wagner alleges that her termination was the result of unlawful retaliation after she notified her supervisors that she believed two of her co-workers were getting assistance from their wives to complete their appraisals in violation of the Uniform Standards of Professional Appraisal Practice (USPAP).

      Ms. Wagner worked mostly from her home and received her appraisal assignments through an online computer program.  Wagner Attestation at ¶ 2.  [#50-2].  She believed that she was not receiving enough work through the computer system, whereas other appraisers were constantly turning down work.  *Id.* at ¶ 3.  She also believed that two other LandSafe appraisers

were using their wives to assist them which allowed them to receive and complete additional assignments.  Wagner Dep. 151:5-18.  [#48-2].

Ms. Wagner agrees that not all assistance is improper.  USPAP only limits assistance that involves contributions to the valuation analysis in a noteworthy way.  Wager Dep. 115:9-15; 2010-2011 USPAP Frequently Asked Question 219 "Significant Appraisal Assistance."  [#48-5].  However, in a 2008 appraisal class, before she was employed by LandSafe, a LandSafe appraiser Kenneth Modenbach mentioned that his wife worked with him.  Wagner Dep. 149:1-12.  In January 2009, after she was employed by LandSafe, Ms. Wagner overheard another appraiser, Gerald Coburn, tell someone that his wife was doing work for him.  *Id.* at 104:25-105:11.  Ms. Wagner believes that both of these appraisers were receiving inappropriate assistance from their wives, because she believes that they were doing too much work for a single appraiser to complete on his own.  *Id.* at 151:5-18.  Ms. Wagner did not know or ask either appraiser what type of assistance he was receiving.

After overhearing Mr. Coburn's conversation in January 2009, Ms. Wagner reported to her manager, Conrad North, that she believed that Mr. Coburn's wife was assisting him.  *Id.* 122:5-23.  Based on that same conversation, Ms. Wagner again reported what she believed to be improper assistance from Mr. Coburn's wife to Nancy Phillips, a human resources employee, and Scott Nicholson, a second level manager, in September 2010.  Email from Adrienne Wagner to Nancy Phillips and Scott Nicholson (September 2, 2009).  [#48-2, p.102].

Ms. Wagner raised the issue again in November 2010 by sending an email to Mr. North and second level manager Clay Vescera.  She complained that she was not getting enough work assignments, and that Mr. Modenbach and Mr. Coburn were getting "the lion's share of the

work." Email from Adrienne Wagner to Conrad North and Clay Vescera (November 22, 2010).

[#50-3]. She stated:

> First of all, anyone who has ever been out in the field knows that it is humanly impossible for 1 appraiser to complete more than 2-3 units per day with any consistency and still maintain quality. Furthermore, Uspap severely limits what outside help from unlicensed people, such as wives, is allowable. When wives drive comps, do computer research, write up the reports etc[.], that is in direct violation of Uspap. So, when upper management at LSA sees appraisers who consistently bill outrageous numbers, such as over $25,000, or whatever, per month, then upper management must be aware that some unethical business practices are in place. As long as upper management is applauding these appraisers, or even just looking the other way, then the company is in reality also in violation of Uspap. If this goes on, then LSA management is creating a culture that encourages unethical business practices. I hope that is not the case.

*Id.*

Mr. Vescera then investigated the billings of Mr. Coburn and Mr. Modenbach. He found that neither man's billings were extraordinarily high. Vescera Dep. 27:4-22. [#48-3]. Ms. Wagner's average daily billings in 2010 were $1,019 compared to $900 from Mr. Modenbach and $1,043 from Mr. Coburn. Binongcal Decl. ¶ 8. [#48-1]. Mr. North also spoke with both men, and they denied that they were getting improper assistance from their wives. Vescera Dep. 26:5-27:7.

Finally, during the last week of February 2011, in a conversation with Mr. Vescera, Ms. Wagner again brought up her concerns about Mr. Coburn's and Mr. Modenbach's wives helping them. Wagner Dep. 230:3-235:24. Ms. Wagner alleges that during this phone call Mr. Vescera said that he had no problem with the men's wives helping them. *Id.* at 232:23-234:22. Mr. Vescera does not remember this phone conversation, but he asserts that he would not have said it was permissible for the men's wives to be assisting them. Vescera Dep. 32:9-13. Ms. Wagner alleges that LandSafe retaliated against her for making these complaints by terminating her

employment and using as a pretextual excuse an email exchange between her and Susan

Schroeder, a regional chief appraiser, that LandSafe characterized as unprofessional.

It is useful when analyzing this allegation of retaliation to consider it in the context of her

performance as an appraiser both before and during the time period in which she alleges that she

was retaliated against.  Overall, performance reviews show that Ms. Wagner was a good

employee.  *See* 2009 Year End Evaluation, 2010 Year End Evaluation.  [#48-2, pp. 109, 120].

However, one reoccurring problem was her tone in email communications.  *Id.*  In her 2009

performance review, Mr. North commented that Ms. Wagner showed improvement "in regard to

accepting alternative opinions," but still needed to work on "utilizing communication as a

resolution tool for her concerns rather than escalation."  2009 Year End Evaluation at 6.  [#48-2

p. 109].  Similarly, in a May 2009 email to Ms. Wagner, Mr. North counseled Ms. Wagner that

she needed to take a more professional response to her communications, and that "[a]ccusations

and demands are not acceptable."  Email from Conrad North to Adrienne Wagner (May 8, 2009).

[#48-2, p. 99].  The email stated, "[c]onsider this a coaching.  Future instances will be addressed

as a performance issue."  *Id.*

In 2010 Ms. Schroeder complained that Ms. Wagner was uncooperative and untrusting.

2010 Year End Evaluation.  [#48-2 p. 120].  In her 2010 performance review, Mr. North

commented that Ms. Wagner needed to work on "constructively handling conflicts to reach a

resolution," and to keep in mind that people asking her to consider alternative viewpoints were

not necessarily questioning her opinion.  *Id.*

In January 2011, following an email from Ms. Wagner, Mr. North warned Ms. Wagner

about her tone in email communications.  Email from Conrad North to Adrienne Wagner

(January 10, 2011).  [#48-2, p. 125].  He explained, "please remember to review your comments

prior to sending them in email.  Lacking face to face interaction, words can often be misconstrued as a reflection of tone that the author may not have meant to convey.  In the case of your e-mail, its verbiage can be construed as aggressive, and accusatory towards a manager, which would not be appropriate under the circumstances."  *Id.*

In response to a March 5, 2011 email from Ms. Wagner, Mr. Vescera counseled Ms. Wagner about sending accusatory emails.  Email from Clay Vescera to Adrienne Wagner (March 7, 2011).  [#48-2, p. 131].  In his email, Mr. Vescera told Ms. Wagner that "writing an accusatory email as this should generally be reserved for the most dire of situations with far stronger evidence . . . not just a misunderstanding of the process."  *Id.*

On March 11, 2011 Ms. Wagner objected to a request to take more pictures for an appraisal.  Emails between Adrienne Wagner and Clay Vescera, March 11, 2011.  [#48-2, pp. 133-36].  Mr. Vescera responded "I understand your concern, but I have concerns with your response to a reviewer simply asking you to provide photos per policy.  There is no need for you to adamantly refuse to do something without having a rational discussion first."  *Id.*  Following that email communication, Mr. Vescera issued Ms. Wagner a final written warning on March 14, 2011.  The final written warning stated that Ms. Wagner needed to do a better job of following the chain of command, and that "the inappropriate tone and comments within your emails dated 3/11/2011 are unacceptable."  Final Written Warning, March 14, 2011.  [#48-2, p. 140].

On May 4 and 5, 2011 Ms. Wagner communicated with Ms. Schroeder via email.  Ms. Schroeder asked for additional explanation for one of Ms. Wagner's appraisals.  Email from Susan Schroeder to Adrienne Wagner (May 4, 2011).  [#50-8].  In her email Ms. Schroeder quoted several USPAP standards including an ethics rule that stated: "An appraiser must not communicate assignment results in a misleading or fraudulent manner.  An appraiser must not

use or communicate a misleading or fraudulent report or knowingly permit an employee or other person to communicate a misleading or fraudulent report." *Id.* In her response to Ms. Schroeder's request, Ms. Wagner stated, "I would like to remind you, Susan, to be careful about making false and malicious accusations against appraisers. Under the Rule of Law in this country, the burden of proof is upon you, my accuser. Any more accusations about fraud can cause you serious legal consequences." Email from Adrienne Wagner to Susan Schroeder (May 5, 2011).

Mr. Vescera determined that the latter communication to Ms. Schroeder was a violation of the final written warning. Vescera Dep. 58:6-9. After conferring with LandSafe's human resources department, Mr. Vescera called Ms. Wagner to get her side of the story, but she responded that she was uncomfortable discussing the incident then or ever. *Id.* at 49:20-24, 65:6-14. Mr. Vescera terminated Ms. Wagner's employment on May 9, 2011.

Ms. Wagner brings two claims based upon her contention that she was actually fired in retaliation for complaining that the two fellow appraisers were obtaining assistance in the preparation of their appraisals that was inappropriate under USPAP. First she contends that her termination violated protection afforded to "whistleblowers" by the Securities Exchange Act of 1934, specifically by the Dodd-Frank amendments to the Act. Second, she alleges that her termination violated Colorado public policy. She voluntarily dismissed two other claims that were included in her Complaint.

**Standard**

"Summary judgment is appropriate 'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Utah Lighthouse Ministry v.*

*Found. for Apologetic Info. & Research*, 527 F.3d 1045, 1050 (10th Cir. 2008) (quoting Fed. R.

Civ. P. 56 (c)).  When deciding a motion for summary judgment, the Court considers "the factual

record, together with all reasonable inferences derived therefrom, in the light most favorable to

the non-moving party . . . ."  *Id.*  The Court does not weigh the evidence or make credibility

determinations.  *Id.*  The moving party has the burden to show that there is an absence of

evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986).  The nonmoving party must "designate specific facts showing that there is a genuine

issue for trial."  *Id.* at 324.  In challenging such a showing, the non-movant "must do more than

simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec.*

*Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

**Conclusions**

*Federal Whistleblower Claim*

Ms. Wagner argues that her reporting of alleged USPAP violations is protected under 15

U.S.C. 78u-6(h)(1)(A)(iii) of the Securities Exchange Act.  I conclude that this claim fails both

as a matter of statutory construction and because there is not genuine dispute of fact as to

whether she was terminated because of her reports of the alleged USPAP violations.

The 2010 Dodd-Frank Act amended the Securities Exchange Act of 1934 to add certain

incentives and protections for whistleblowers.  15 U.S.C. § 78u-6.  Initially, and in my view

dispositively, the statute defines the term "whistleblower": "any individual who provides, or 2 or

more individuals acting jointly who provide, *information relating to a violation of the securities*

*laws to the [Securities Exchange] Commission*, in a manner established, by rule or regulation, by

the Commission."  15 U.S.C. § 78u-6(a)(6) (emphasis added).  Ms. Wagner did not provide any

information to the Commission, whether relating to a violation of the securities laws or

otherwise, prior to her termination. Accordingly, she was not a "whistleblower" as defined in this statute.

Notwithstanding that she was not a "whistleblower" as defined, Ms. Wagner urges this Court to interpret another section of the statue as protecting her against retaliation for reporting the alleged USPAP violation to her employer. To understand her argument we look first at the specific protections provided by the statute, which are found at § 78u-6(h):

> In general. No employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a *whistleblower* in the terms and conditions of employment because of any lawful act done by the *whistleblower*—
>
> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m))1, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

(emphasis added).

Ms. Wagner concedes that subsections (i) and (ii) have no application to her. However, she argues that five district courts, including one in this district, have found protection for persons in situations similar to hers under subsection (iii), which has been described as a catch-all provision in which disclosure to the Securities and Exchange Commission is not required. *See Egan v. TradingScreen, Inc*., 10 CIV. 8202 LBS, 2011 WL 1672066 (S.D.N.Y. May 4, 2011) ("[t]he contradictory provisions of the Dodd–Frank Act are best harmonized by reading 15 U.S.C. § 78u6(h)(1)(A)(iii)'s protection of certain whistleblower disclosures not requiring reporting to the SEC as a narrow exception to 15 U.S.C. § 78u–6(a)(6)'s definition of a whistleblower as one who reports to the SEC."); *Genberg v. Porter,* No. 11 Civ. 2434(WYD)(MEH), 2013 WL 1222056, at *10 (D.Colo. Mar. 25, 2013); *Kramer v. Trans-lux*

*Corp.,* No. 11 Civ. 1424(SRU), 2012 WL 4444820, at *3–5 (D.Conn. Sept. 25, 2012); *Nollner v.*

*S. Baptist Convention, Inc.,* 852 F.Supp.2d 986, 993–95 (M.D.Tenn.2012); *Murray v. UBS Sec.,*

*LLC*, 12 CIV. 5914 JMF, 2013 WL 2190084 (S.D.N.Y. May 21, 2013).

I respectfully disagree with those cases and Ms. Wagner's argument.  No matter what

else one might say about subsection (iii), it is part of section (h) which relates only to

"whistleblowers."  That term is defined in the statute as indicated above.  There is no separate or

different definition of "whistleblower" in subsection (iii).  In my view, the plain language of the

statute compels the conclusion that Ms. Wagner can find no more protection for the conduct of

which she complains in subsection (iii) than she admittedly could not find in subsections (i) and

(ii).  When the statutory text is plain and unambiguous, it is the Court's job to apply the statute

according to its terms.  *Carcieri v. Salazar,*  555 U.S. 379, 387 (2009).

I also note that just this week a panel of the Fifth Circuit issued an opinion with which I

agree entirely.  *See Asadi v. G.E. Energy (USA), LLC,* No. 12-20522, 2013 WL 37424 (5th Cir.

July 17, 2013).  As the court put it, the definition in § 78u-6(a)(6) describes *who* a whistleblower

is.  Section § 78u-6(h)(1)(A) describes *what actions* by protected individuals constitute protected

activity.  *Id.* at *4.

The court in *Asadi* also addressed the suggestion that subsection (iii) cannot reconciled

with the rest of the whistleblower statute if the strict definition of "whistleblower" is applied to

it, an alleged conflict that troubled the SEC itself (and the several district court decisions cited

above).  Not so, the court concluded, using a hypothetical to illustrate its thinking.  An employee

reports a securities violation to his employer fires him, unaware that the employee had also

reported the information to the SEC.  The employee is a "whistleblower," but he cannot prove

that he was fired because he disclosed the securities violation to the Commission.  Nevertheless,

assuming that the report to his employer was required or protected by Sarbanes-Oxley, he can

state a claim under the Dodd-Frank "whistleblower" statute, because 15 U.S.C. § 78u-6(h)(iii)

incorporates the anti-retaliation provisions of the Sarbanes-Oxley Act of 2002. Whistleblowers

in that situation are better off suing under Dodd-Frank than directly under Sarbanes-Oxley which

requires a complaint to the Secretary of Labor as a prerequisite, has a short statute of limitations,

and does not provide for double damages. For the same reason, if subsection (iii) were

interpreted to permit a non-whistleblower to sue under Dodd-Frank, then Sarbanes-Oxley's anti-

retaliation provisions would be moot; no one would ever sue directly under that statute. *Id.* at 6-

7.

I acknowledge that my view, which turns on the plain language of the definition of

"whistleblower," is a minority view at this point, with only the *Asadi* case in agreement.

Nevertheless, even if I were to assume that § 78u-6(h)(1)(A)(iii) is an exception to the

whistleblower definition and therefore does not require SEC reporting, I still conclude that Ms.

Wagner's purported whistleblowing is not protected activity under the statute. Section 78u-

6(h)(1)(A)(iii) by its own language applies to disclosures that are required or protected by

Sarbanes–Oxley, the Securities Exchange Act, 18 U.S.C. § 1513(e), or other laws and

regulations subject to the jurisdiction of the SEC. Ms. Wagner identifies 15 U.S.C. § 1639e(E)

as the source of the protection she invokes. That statute, which was added to the Truth in

Lending Act as part of the Dodd-Frank Amendments in 2010, provides:

> Any mortgage lender, mortgage broker, mortgage banker, real estate broker, appraisal
> management company, employee of an appraisal management company, or any other
> person involved in a real estate transaction involving an appraisal in connection with a
> consumer credit transaction secured by the principal dwelling of a consumer who has a
> reasonable basis to believe an appraiser is failing to comply with the Uniform Standards
> of Professional Appraisal Practice, is violating applicable laws, or is otherwise engaging
> in unethical or unprofessional conduct, shall refer the matter to the applicable State
> appraiser certifying and licensing agency.

Ms. Wagner argues that this statute required that she disclose what she perceived as violations of USPAP.  The problem is that §78u-6(h)(1)(A)(iii), on which Ms. Wagner's claim is based, does not mention or incorporate the Truth in Lending Act.  Ms. Wagner argues to the contrary based on a different version of (iii) that counsel discovered.  In the public law in which Dodd-Frank was originally published the statute referred to "disclosures that are required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. 7201 et seq.), the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.), including section 10A(m) of such Act (15 U.S.C. 78f(m)), section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission."  Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 §922 (2010).  The same is true for the print versions of the United States Code Service.  However, Ms. Wagner discovered that on the Government Printing Service's website, the statute as codified at 15 U.S.C. § 78u-6(h)(1)(A)(iii) is worded differently.  The words "the Securities Exchange Act" are replaced with "this chapter."  [#59-1].  She argues that "this chapter" means Dodd-Frank Act, and therefore, if the Government Printing Service's online version is the correct version, then subsection (iii) does incorporate 15 U.S.C. 1639e(E) because it was added to the Truth in Lending Act by Dodd-Frank.

I give counsel credit for creativity.  However, this Court need not decide which of the versions of the statute is the "correct" version.  Assuming for the benefit of argument that the online version (which I note was not the version relied upon by the Fifth Circuit in *Asadi*) is the correct version, the words "this chapter" in context refers to the Securities Exchange Act, not Dodd-Frank.  This interpretation does not comport with the clear language of the statute.  "This chapter" refers to title 15, chapter 2B of the United States Code.  The webpage containing the online version explains that it is Title 15-Commerce and Trade, Chapter 2B- Securities

Exchanges. [#59-1]. Dodd-Frank, in its entirety at Public Law 111-203, does not have chapters, only subtitles and sections. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203 §922 (2010).

However, even if I were to assume, contrary to the conclusions discussed above, that Ms. Wagner could be viewed as a "whistleblower," and that subsection (iii) of the whistleblower statute incorporated 15 U.S.C. § 1639e(E) from the Truth in Lending Act, I conclude that Ms. Wagner's first claim fails for what is perhaps the most fundamental problem of all. She has not raised a genuine issue of material fact concerning whether her telling her supervisors that two fellow appraisers were receiving inappropriate assistance from the wives had anything at all to do with her termination. The statute states that "[n]o employer may discharge . . . a whistleblower . . . *because of* any lawful act done by the whistleblower . . . in making disclosures that are required or protected . . ." 15 U.S.C. § 78u-6(h)(1)(A)(iii) (emphasis added). There must be some evidence of causation.

To begin with, and having reviewed all of the evidence Ms. Wagner has provided in opposition to the pending motion, I find that Ms. Wagner has provided no evidence that there were any USPAP violations. What she knows, and I will assume for this purpose is true, is that Mr. Modenbach told her in 2008 that he was receiving assistance from his wife, and that in 2009 she overheard Mr. Coburn tell another person that he too received assistance from his wife. Ms. Wagner does not know, nor apparently did she make any effort to discover, what that assistance was. She acknowledges, and frankly common sense would tell us, that there are some things that a spouse could do that would not cause the appraiser to violate any professional standard. Ms. Wagner does nothing more than assume, based on what she believes to have been the volume of work that the two appraisers were doing, that they must have had significant and inappropriate

assistance.  The facts do not bear out even that speculation.  When, in response to one of Ms. Wagner's complaints about the two appraisers her supervisor investigated, it turned out that Modenbach was billing less work than Ms. Wagner, and Mr. Coburn was billing only slightly more.

But I am willing to assume that if Ms. Wagner had a sincere and rational belief that there were USPAP violations occurring, and reported her suspicions to her supervisors, and was fired because of those reports, there might be some "whistleblowing" protection for her if the statute otherwise applied.  The fundamental flaw in this claim that overwhelms everything else is that she has no evidence that those reports or complaints caused or contributed to her termination.  When asked in her deposition what connects those complaints in her mind to her termination, she answered "the timing," and only the timing.  Deposition [#48-2] at pages 271-72.  That's it.  She complained about the fellow appraisers' "admissions" on four occasions between 2009 and 2011 – the same admissions which had occurred in 2008 (Modenbach) and 2009 (Coburn).  She wasn't fired or, so far as the record discloses, otherwise disciplined because of those complaints after any of those four occasions.

The last such complaint was made in February 2011, but she was not terminated until May.  The undisputed facts show that Ms. Wagner had been counseled and warned numerous times during her employment about her tone in email communications.  Despite these warnings, she sent an email that her managers deemed inappropriate in March 2011 and was issued a "final written warning."  After receiving this final written warning, Ms. Wagner sent another accusatory email in May 2011.  Her manager, Mr. Vescera, determined that this was a violation of the final written warning and terminated her employment.

Courts do not resolve fact disputes on motions for summary judgment.  Juries do that.  If there was anything – anything at all – beyond Ms. Wagner's speculation that her complaint about the fellow employers in February 2011, or even the accumulation of her raising the same complaint four times, had anything to do with the decision to terminate her employment (and I could overlook the statute interpretation problems), she would get her trial.  If there was anything at all from which a rational juror could find that the employer's basing the termination on the hostile tone of her emails despite multiple counselings and warnings was a pretext, and the real reason was that the employer was angry because she reported USPAP violations by the fellow appraisers, she would get her trial.  But, there is nothing.  Having construed all the evidence in her favor, I find and conclude that a jury could do no more with it than engage in sheer and unfounded speculation, as I find that Ms. Wagner has.  That is not good enough to put the defendant through a trial.

I am not questioning the sincerity of Ms. Wagner's beliefs.  I have no basis to do so.  The record shows that she was a good appraiser, and I assume that she really does believe that the other two appraisers were doing something improper, and that she was fired because she reported her suspicions to her supervisors.  But, there is no support for her beliefs in the evidence.

*Wrongful Discharge in Violation of Public Policy Claim*

Because I have determined that Ms. Wagner's federal whistleblower claim does not survive, only her state law claim remains.  There is no independent basis for federal jurisdiction over that claim, and the Court has the discretion either to exercise or decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367.  *See, e.g., Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1164-65 (10th Cir. 2004).  One might say that, particularly because the state claim turns on an issue of Colorado public policy that arguably has

not been decided by Colorado's state courts, it would be wiser for this Court not to barge in. However, this case is on the eve of trial, and the Court's comments above on the causation issue probably foretell what might happen if the parties were to litigate the public policy claim in state court.[1]  In the circumstances I do not find that a remand at this point it would serve the values of economy, convenience, fairness, or comity to remand the state law claim.  I suspect that both parties want an answer.

It is not disputed that Ms. Wagner's employment was "at will."  As a general rule in Colorado, an employer can terminate an at-will employment relationship without cause and without incurring legal liability.  *Coors Brewing Co. v. Floyd,* 978 P.2d 663, 666 (Colo. 1999).  However, in *Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 104-105 (Colo. 1992), the Colorado Supreme Court recognized a public policy exception to this rule.  The public policy exception allows at-will employees to pursue claims for wrongful discharge if they allege that they were discharged because they either (1) refused to engage in conduct that would violate public policy, or (2) engaged in conduct that is protected or encouraged as a matter of public policy.  *Coors Brewing Co*., 978 P.2d at 667.  Ms. Wagner alleges that her firing fits within this exception, because violations of the Uniform Standards of Professional Appraisal Practice are an important public policy concern, and it would therefore be contrary to public policy to fire an appraiser because she reported a significant USPAP violation by another appraiser.

To my knowledge neither the Colorado legislature nor any Colorado appellate court has addressed the public policy exception in a case quite like this case.  It is not this Court's role to set Colorado public policy.  However, for present purposes I will assume, without deciding, that if Ms. Wagner was fired because she reported a significant USPAP violation, that would be

---

[1] I am not a fan of a court's granting (or denying) a dispositive motion on the eve of trial.  However, the parties' briefing on the pending motion was not completed until four days ago.

contrary to public policy.  People and institutions rely on appraisals in making important financial decisions.  We have seen instances in recent years where, for example, inflated appraisals have contributed to credit issues and even to serious problems in the economy.  I do not view this as substantially different from people's need to rely on the fact that opinions of doctors or lawyers or engineers or other professionals should be reached based upon the application of the professional standards applicable to their respective fields.

The problem here, as discussed above with respect to the statutory claim, is that Ms. Wagner doesn't have the goods.  There is no creditable evidence that a violation occurred, and more importantly, no evidence that reporting the alleged violation to her employer caused or contributed to the employer's decision to terminate her employment.  Without causation, the state claim has no more potential than the statutory claim.

**Order**

1. Defendant's motion for summary judgment [#48] is GRANTED.  The civil action and all claims therein are dismissed with prejudice.

2. Defendant's motion in limine [#53] is DENIED as moot.

3. Defendant's motion to exclude plaintiff's expert [#54] is DENIED as moot.

4. As the prevailing party, defendant is awarded its costs pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 19th day of July, 2013.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge